

FILED
IN OPEN COURT

DEC 10

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:15-CR-178-1-AJT |
| | ) | |
| HAROLD BAILEY GALLISON II, | ) | |
| a/k/a "B.J. GALLISON," | ) | |
| a/k/a "Bart Williams," | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Counts One, Three, and Five of the Indictment, and following facts, are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

### Background

1. Defendant Harold Bailey GALLISON II, a/k/a "B.J. Gallison," a/k/a "Bart Williams," was a resident of California.

2. GALLISON, along with Michael Randles, controlled and operated Sandias Azucaradas, also known at various times as Moneyline Brokers and Trinity Asset Services (collectively, "Moneyline"). Moneyline was an offshore brokerage company located in San Jose, Costa Rica, and was founded in or around 2002. GALLISON controlled and operated Moneyline from his home in California, and supervised and provided direction to various Moneyline employees and associated persons located in Costa Rica and in the United States.

3. Warrior Girl Corporation ("Warrior Girl") was a Nevada Corporation that was quoted on the Over-the-Counter ("OTC") securities market and that traded under the symbol "WRGL."

4. Everock Incorporated ("Everock") was a Nevada Corporation that was quoted on the OTC securities market and that traded under the symbol "EVRN."

5. Bryn Resources, Inc. ("Bryn Resources") was a Colorado company that was quoted on the OTC securities market and that traded under the symbol "BRYN."

## The Overall Criminal Enterprise

6. The purpose of Moneyline was to trade securities, primarily microcap or "penny stocks," through multiple nominee brokerage accounts in the United States, often in connection with market manipulation or "pump-and-dump" securities fraud schemes, and to launder the proceeds of these schemes by transferring the proceeds from the nominee brokerage accounts to and through Moneyline nominee bank accounts in the United States and overseas.

7. In or about and between September 2008 and March 2014, GALLISON and his co-conspirators, including Ann Marie Hiskey, Carl Kruse Jr., Carl Kruse Sr., Frank Zangara, Mark Dresner, and Charles Moeller, devised and engaged in a scheme whereby they agreed to defraud investors and potential investors in various United States publicly traded-companies, including Warrior Girl and Everock. To further the scheme, GALLISON and his co-conspirators fraudulently concealed the true ownership of various United States publicly traded companies, and engineered artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies, including Warrior Girl and Everock.

8. GALLISON and his co-conspirators, including Randles, Hiskey, and Roger Coleman, also laundered the proceeds of the securities fraud, including the proceeds from the sales of shares of Warrior Girl, Everock, and Bryn Resources, by moving money into and out of

2

the United States through a series of nominee bank accounts. GALLISON and his co-conspirators assisted Moneyline clients with the facilitation of fraudulent stock deals and money laundering, and deliberately sought to circumvent U.S. securities laws and evade criminal and regulatory authorities.

### Conspiracy to Commit Wire Fraud: Warrior Girl

9. Beginning at least as early as in or about January 2009, and continuing through at least in or about March 2014, in the Eastern District of Virginia and elsewhere, Carl Kruse Jr., and Carl Kruse Sr., did knowingly and willfully combine, conspire, confederate and agree with each other and others to commit certain offenses against the United States, namely, wire fraud, that is, having devised a scheme and artifice to defraud and obtain money and property from investors in Warrior Girl's common stock by means of materially false and fraudulent pretenses, representations, and promises, to knowingly and willfully use interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343. GALLISON and Hiskey joined the conspiracy no later than in or about March 2010.

10. Kruse Jr. and Kruse Sr. concealed, through a series of nominee brokerage accounts and nominee bank accounts (the "Kruse Accounts"), that they controlled virtually all of the free trading shares of Warrior Girl.

11. In or around June 2009, a promotional campaign in the Eastern District of Virginia and elsewhere began touting Warrior Girl's purported business prospects.

12. In early 2010, Kruse Jr. and Kruse Sr., in order to conceal their ownership and control of their Warrior Girl shares, transferred approximately 14.9 million shares of Warrior Girl into brokerage accounts in the names of various shell companies with nominee directors

under the Moneyline umbrella. This included the transfer of several million shares that was initiated by a letter from Kruse Jr. to a brokerage firm that was located in the Eastern District of Virginia.

13. GALLISON and Hiskey agreed with Kruse Jr. and Kruse Sr. to enlist other co-conspirators that were willing to engage in promotional activities and secret, coordinated trading in Warrior Girl shares in an effort to artificially inflate the price and volume of the shares, so that Kruse Jr. and Kruse Sr. could later sell their shares to unsuspecting investors at artificially inflated prices.

14. In or about June 2010, Kruse Jr. and Kruse Sr. expressed their dissatisfaction with an earlier promotional campaign to Hiskey. Thereafter, GALLISON and Hiskey openly discussed the fraudulent nature of the Warrior Girl stock manipulation, and the need for a promotional campaign.

15. In or around June 2010, GALLISON and Hiskey enlisted co-conspirators to assist Kruse Jr. and Kruse Sr.'s efforts to create an artificial market for Warrior Girl shares by engaging in a promotional campaign, including drafting and disseminating press releases, and coordinated trading of Warrior Girl shares. To the investing public, these trades would have given the false appearance that there was an increasing market demand for Warrior Girl shares.

16. In or around July 2010, GALLISON, Hiskey, Kruse Jr., Kruse Sr., and others caused the issuance and dissemination nationally, including in the Eastern District of Virginia and elsewhere, of a Warrior Girl press release forecasting false and misleading revenue projections.

17. After fraudulently inflating the price and volume of Warrior Girl stock, GALLISON, Hiskey, Kruse Jr., and Kruse Sr. sold their shares of Warrior Girl to unsuspecting

victim investors in the Eastern District of Virginia and elsewhere through the Kruse Accounts and nominee Moneyline accounts, thereby generating substantial illegal proceeds.

18. After liquidating the Warrior Girl shares from the Moneyline accounts, GALLISON, Hiskey, Kruse Jr., Kruse Sr., and others transferred the proceeds from nominee brokerage accounts in the United States, to bank accounts located overseas, and back to bank accounts in the United States in order to hide the source, ownership and control of the fraudulent proceeds.

19. As a result of the scheme, between in or around January 2009 and in or around March 2014, the co-conspirators liquidated approximately 61 million shares of Warrior Girl, generating gross proceeds of approximately $2.9 million, and approximately $1,996,903 in net losses to legitimate investors who were on the purchasing end of the Warrior Girl stock "dump." Approximately $481,360 of the losses occurred during GALLISON's participation in the conspiracy.

### Conspiracy to Commit Wire Fraud: Everock

20. Beginning at least as early as in or about September 2008, and continuing through at least in or about September 2010, in the Eastern District of Virginia and elsewhere, GALLISON together with his co-conspirators including Hiskey, Zangara, Dresner, and Moeller, did knowingly and willfully combine, conspire, confederate and agree with each other and others to commit certain offenses against the United States, namely, wire fraud, that is, having devised a scheme and artifice to defraud and obtain money and property from investors in Everock's common stock by means of materially false and fraudulent pretenses, representations, and promises, to knowingly and willfully use interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

21. In order to effectuate the Everock pump-and-dump scheme, in or around August 2008, Zangara, Moeller, and others facilitated the merger of a shell company they controlled, Everock, with Nature's Peak, a privately held operating company, and thereby obtain nearly all of Everock's shares.

22. Beginning in or around March 2009, Zangara and Moeller initiated the transfer of millions of their Everock shares into Moneyline-controlled nominee brokerage accounts.

23. Zangara and Dresner then caused the distribution of the Everock shares within Moneyline accounts to promoters who both touted Everock and made purchases of Everock shares in the open market to increase the volume of trading in Everock stock. The promotional materials included website postings, email blasts, and online videos, which were disseminated in the Eastern District of Virginia and elsewhere, to create the appearance that Everock had significant business and growth prospects, and to generate investor interest so that, among other things, the investing public would take interest in Everock. During the promotional campaign, Zangara, Dresner, and Moeller continued to transfer millions of Everock shares to various promoters while also liquidating tens of millions of shares, including through various Moneyline accounts.

24. Throughout the summer of 2010, Zangara and Moeller continued to liquidate tens of millions of Everock shares out of Moneyline accounts. GALLISON, Hiskey, Zangara, and Moeller coordinated those sales. In response to tens of millions of shares being transferred to Moneyline, GALLISON told a co-conspirator that he expected the Everock share price would run up on volume and that Moneyline would be able to liquidate all of the Everock shares once the promotions started, as the co-conspirators were "loading up for bear."

25. In connection with the summer-2010 promotional campaigns, GALLISON, Hiskey, Zangara and others discussed repeatedly the need to coordinate the sale of Everock shares with the press releases and promotional activities, and to secretly coordinate the liquidation of the Everock shares through multiple brokerage accounts.

26. As the press releases were being disseminated simultaneously with the promotional campaigns they had initiated and funded, GALLISON, Hiskey, Zangara, and Dresner sold Everock shares to unsuspecting investors, including in the Eastern District of Virginia.

27. As a result of the scheme, between in or around September 2008 and in or around September 2010, the co-conspirators liquidated approximately 382 million shares of Everock, generating gross proceeds of approximately $3.6 million, and approximately $3,304,612 in net losses to legitimate investors who were on the purchasing end of the Everock stock "dump." All of the losses occurred during GALLISON's participation in the conspiracy.

### Conspiracy to Commit Money Laundering

28. Beginning at least as early as in or about 2008, and continuing through at least in or about June 24, 2015, in the Eastern District of Virginia and elsewhere, GALLISON together with his co-conspirators including Randles, Hiskey, and Coleman, did knowingly and willfully conspire to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was

7

designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

29. One object of the money laundering conspiracy was the laundering of proceeds from the sale of stock in Bryn Resources. Beginning in or around November 2009, a group of Moneyline's clients, who held a controlling interest in Bryn Resources, deposited their shares in Moneyline-controlled accounts, with some of those shares being deposited into an account in the Eastern District of Virginia. In or around November and December 2009, a promotional campaign touting Bryn Resources took place, which included the issuance of press releases and the touting of Bryn Resources' purported assets and operations on websites. During this same time period, Moneyline sold over 3.5 million shares of Bryn Resources, generating proceeds of approximately $756,000. The sale of Bryn Resources shares from Moneyline accounts continued until approximately August 2010, when the majority of the shares in the Moneyline accounts had been liquidated. Following the liquidation of shares, GALLISON and his co-conspirators caused the transfer of the proceeds from Moneyline accounts in the United States to Moneyline offshore accounts.

30. On or about June 30, 2010, while still holding Bryn Resources shares in Moneyline accounts, GALLISON discussed the fraudulent promotion of Bryn Resources, as well as the fact that a client of Moneyline who had been involved with the Bryn Resources promotion had been charged by the Securities and Exchange Commission (the "SEC") for a number of other pump-and-dump schemes. During the discussion, GALLISON explained that "[e]veryone

8

acknowledges that they're just a pump-and-dump outfit. Wildly successful. They did the BRYN deal. . . . Their outrageous claims by their in-house newsletter writers were just bogus bullshit."

### Overall Amount Laundered by Moneyline

31. GALLISON and his co-conspirators used Moneyline and various Moneyline entities to launder proceeds of a number of securities fraud schemes beyond Warrior Girl, Everock, and Bryn Resources. In total, between 2008 and 2015, more than $25 million, but less than $65 million, in securities fraud proceeds were laundered through Moneyline. The amount laundered was reasonably foreseeable to GALLISON.

### Concluding Statements

32. The acts described above were done willfully and knowingly and with the specific intent to violate the law, and not by accident, mistake, inadvertence, or other innocent reason.

33. This Statement of Facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

By: _____
Kosta S. Stojilkovic
Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
kosta.stojilkovic@usdoj.gov

9

By:
ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division, U.S. Department of Justice

/s/
Benjamin Singer
Deputy Chief
N. Nathan Dimock
Senior Trial Attorney
Special Assistant United States Attorney (EDVA)
Tel: (202) 514-0095
Fax: (202) 514-6118
nathan.dimock@usdoj.gov
Michael T. O'Neill
Trial Attorney
Special Assistant United States Attorney (EDVA)
Tel: (202) 616-1545
Fax: (202) 514-0152
michael.t.oneill@usdoj.gov
1400 New York Avenue, NW
Washington, DC 20530

10

Defendant's Stipulation and Signature
After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, HAROLD BAILEY GALLISON II, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
HAROLD BAILEY GALLISON II

Defense Counsel's Signature
I am the attorney representing HAROLD BAILEY GALLISON II. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Patrick Q. Hall
Counsel for the Defendant

11