IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:15cr178-1-AJT |
| | ) | |
| HAROLD BAILEY GALLISON II, | ) | |
| a/k/a "B.J. GALLISON," | ) | Sentencing Hrg: March 18, 2016 |
| a/k/a "Bart Williams," | ) | |
| | ) | |

**POSITION OF THE UNITED STATES ON SENTENCING**

Defendant Harold Bailey "B.J." Gallison II is the second of five defendants to be sentenced for his participation in market manipulation and money laundering schemes tied to Moneyline Brokers, also known at various times as Trinity Asset Services and Sandias Azucaradas (hereinafter "Moneyline"). Gallison is the lead defendant in the case. He pled guilty to two counts of wire fraud conspiracy concerning the manipulation of two penny stocks—Warrior Girl Corporation ("Warrior Girl") and Everock Incorporated ("Everock")—as well as to an overarching money laundering conspiracy that moved the proceeds of these and many other market manipulation schemes. Under his leadership, between 2008 and 2015, Moneyline facilitated securities fraud schemes totaling more than $25 million in criminal proceeds, and laundered those proceeds through a series of financial transactions, ultimately resulting in the transfer of a majority of the proceeds to Moneyline clients who participated in the market manipulations.

The United States submits this memorandum to address the applicable guideline range, and to discuss the applicability of other factors pertinent to the Court's sentencing decision. The

Probation Officer determined that the defendant's total offense level is 38, which at criminal history category II corresponds to an advisory sentencing range of 262 to 327 months.  See Final Presentence Investigation Report ("PSR") (Dkt. No. 187).[1]  The government largely agrees with the Probation Officer's analysis, but submits for reasons elaborated herein that the defendant's total offense level should be calculated at 37, resulting in an advisory sentencing range of 235 to 293 months.  In his plea agreement, the defendant agrees with the government's approach, but reserves the right to contest the application of two guidelines points for leadership role.

Under any of these approaches, the defendant faces an unquestionably severe sentence under the sentencing guidelines. But the facts of this case justify the imposition of such a sentence.  The defendant is a fraud recidivist who established Moneyline prior to going to prison for another securities-related offense, and who resumed control of Moneyline upon his release from prison.  He did so despite being permanently barred by the Securities and Exchange Commission ("SEC") from engaging in brokerage or other activities related to the issuance or trading of penny stocks.  He used an assumed name while running Moneyline in order to hide the link to his past.

Moneyline's structure was designed to facilitate and hide unlawful activities in the securities markets, including by (**1**) establishing and using nominee omnibus accounts in U.S. brokerages that hid the identity of Moneyline's clients and their *de facto* ownership of the stocks at issue; (**2**) coordinating and executing mass sales of such stocks during pre-arranged stock promotions; and (**3**) funneling stock sale proceeds back to Moneyline clients through a series of

---

[1] The guideline range identified in the PSR is based in part on a three-level reduction for acceptance of responsibility.  Consistent with the PSR analysis, if the Court determines that the defendant has accepted responsibility, the United States moves the Court to adjust the defendant's offense level downward by an additional level pursuant to U.S.S.G. § 3E1.1(b) for timely notifying the government of his intention to plead guilty.

international and domestic accounts that concealed the link between the money and the market manipulation schemes.

As demonstrated in numerous recorded calls obtained by the Federal Bureau of Investigation ("FBI"), the defendant knew and understood how a substantial portion of Moneyline clients were using the business, and he agreed to help them achieve their criminal objectives.  In addition, the PSR suggests that the defendant has sheltered assets by placing them in the name of his common-law wife, and that he has yet to provide complete information about such assets to the Probation Office or the government.  As noted in the PSR, the defendant has not filed a federal tax return since 2009 despite running a multi-million dollar brokerage business.

These facts reveal a calculating, criminal disposition and show the need for deterrence, both specifically as to this defendant and generally so that others are not left to conclude that large scale financial crimes pay off in light of modest prison sentences.  For these reasons, the government asks the Court to impose a sentence at the bottom of the applicable guideline range. The government also asks the Court to impose forfeiture, and will present a proposed forfeiture order for the Court's consideration at sentencing.  Pursuant to the provisions of this defendant's and the related defendants' plea agreements, the government will not ask for entry of a restitution order at the time of sentencing, but rather will submit proposed restitution orders for all defendants that have a restitution obligation once the victims are fully identified.

The defendant is cooperating with the government's investigation of others.  Unlike other cooperators who testified at the trial of co-defendant Mark Dresner, the government is not filing a reduction motion at this defendant's sentencing.  Rather, the government intends to continue to debrief the defendant following sentencing, including about Moneyline clients and stock deals

beyond those identified in the Indictment, prior to making a final evaluation of the defendant's

cooperation.  In order to facilitate this process, the government asks that the Court delay the

defendant's self-surrender by a period of at least six months.[2]  Such a delay would allow the

defendant to continue his cooperation, and would allow the parties to return before this Court

upon a motion pursuant to Criminal Rule 35(b) if the defendant successfully completes his

cooperation.

## I.      BACKGROUND

The facts of the defendant's case are largely set forth in his signed Statement of Facts

(Dkt. No. 117).  Along with his business partner, Michael Randles, the defendant founded and

operated Moneyline.  Id. ¶2.  He did so from his home in San Diego, and supervised various

Moneyline employees and associated persons located in Costa Rica and in the United States

through frequent telephone and text conversations.  Id.  The purpose of Moneyline was to trade

securities, primarily microcap or penny stocks, through multiple nominee brokerage accounts in

the United States, often in connection with market manipulation schemes, and to launder the

proceeds of these schemes by transferring the proceeds from the nominee brokerage accounts to

and through Moneyline nominee bank accounts in the United States and overseas.  Id. ¶6.

Moneyline was founded in 2002; from August 2003 through March 2006 the defendant did not

have any direct role in its management as he was incarcerated on his prior conviction.  As he

acknowledged in his testimony at the Dresner trial, the defendant resumed an active role in

Moneyline upon his release from prison.

---

[2] Should the parties need additional time for cooperation past six months from the sentencing
date, the parties would file a motion to that effect with the Court.

Between at least September 2008 and March 2014, the defendant and his co-conspirators devised and engaged in a scheme to defraud investors in various United States publicly traded-companies, including Warrior Girl and Everock.  Id. ¶7.  In addition, the defendant and his co-conspirators laundered proceeds of securities frauds, including the proceeds from the sales of shares of Warrior Girl, Everock, and another penny stock known as Bryn Resources Inc. ("Bryn Resources"), by moving money into and out of the United States through a series of nominee bank accounts.  Id. ¶8.  The defendant and his co-conspirators assisted Moneyline clients with the facilitation of fraudulent stock deals and money laundering, and deliberately sought to circumvent U.S. securities laws and evade criminal and regulatory authorities.  Id.

With respect to the Warrior Girl scheme, the defendant joined the conspiracy by March 2010.  Id. ¶9.  Co-defendants Carl Kruse Jr. and Carl Kruse Sr. allegedly had already begun to manipulate the stock prior to this time, but sought Moneyline's services to continue the manipulation and to hide their ownership and control.  Id. ¶¶9-10, 12.  The defendant, along with co-defendant Ann Hiskey, agreed to enlist other co-conspirators to engage in promotional activities and secret, coordinated trading in Warrior Girl shares in an effort to artificially inflate the price and volume of the shares, so that Kruse Jr. and Kruse Sr. could later sell their shares to unsuspecting investors at artificially inflated prices.  Id. ¶¶13, 15-16.  The defendant and Hiskey openly discussed the fraudulent nature of the Warrior Girl stock manipulation, and the need for a promotional campaign, in recorded telephone calls that were obtained by the FBI.  Id. ¶14.  As a result of the scheme, the co-conspirators caused approximately $1,996,903 in net losses to legitimate investors who were on the purchasing end of the Warrior Girl stock "dump." Approximately $481,360 of those losses occurred during the defendant's participation in the conspiracy.  Id. ¶19.

5

With respect to the Everock scheme, from at least September 2008 through September 2010, the defendant and his co-conspirators engaged in manipulation of Everock stock. Id. ¶20. Individuals associated with the Everock stock deal, including co-defendant Frank Zangara, deposited shares into Moneyline accounts, and caused the distribution of some of those shares to promoters who touted Everock and made purchases of Everock shares in the open market to increase the volume of trading in Everock stock. Id. ¶¶22-23. Zangara and others then caused Moneyline to liquidate the shares during waves of promotional activity by the company. Id. ¶24. On a recorded call, the defendant described the process of depositing shares in advance of coordinated press campaigns as "loading up for bear." Id. As a result of the scheme, the co-conspirators caused approximately $3,304,612 in net losses to legitimate investors who were on the purchasing end of the Everock stock "dump." All these losses occurred during this defendant's participation in the conspiracy. Id. ¶27.

In addition to participating in the Warrior Girl and Everock schemes, the defendant caused Moneyline to launder the proceeds of other, comparable market manipulations. One of those other manipulations affected the stock of Bryn Resources. In or around November 2009, a group of individuals who held a controlling interest in Bryn Resources deposited their shares in Moneyline-controlled accounts. In or around November and December 2009, a promotional campaign touting Bryn Resources took place, which included the issuance of press releases and the touting of Bryn Resources' purported assets and operations on websites. Moneyline then liquidated the shares and caused the transfer of the proceeds from accounts in the United States to other offshore accounts. In a recorded call, the defendant explained that "[e]veryone acknowledges that [the Bryn stock owners are] just a pump-and-dump outfit. Wildly successful.

6

They did the Bryn deal. . . . Their outrageous claims by their in-house newsletter writers were just bogus bullshit." <u>Id</u>. ¶30.

Further, the defendant agrees that Moneyline and various Moneyline entities laundered proceeds of a number of securities fraud schemes beyond Warrior Girl, Everock, and Bryn Resources.  In total, between 2008 and 2015, more than $25 million in securities fraud proceeds were laundered through Moneyline—an amount that was reasonably foreseeable to this defendant. <u>Id</u>. ¶31.

## II.    THE APPROPRIATE GUIDELINE RANGE

The parties and the Probation Officer largely agree as to the applicable guidelines. However, some areas of disagreement and potential disagreement remain.

As an initial matter, the parties and the Probation Officer agree that all three counts of conviction are grouped for guidelines purposes.  <u>See</u> PSR ¶82; Plea Agreement (Dkt. No. 116) ¶4.f.  The parties and the Probation Officer also agree that the proper approach under the grouping rules is to calculate the overall guidelines range for the money laundering conspiracy, pursuant to U.S.S.G. 2S1.1, rather than the guidelines applicable to the Warrior Girl and Everock the wire fraud conspiracies, because the money laundering guidelines are higher.  <u>See</u> PSR ¶¶83-88; Plea Agreement ¶4.a; <u>see also</u> U.S.S.G. §3D1.3(b) ("When the counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level.").

Under the money laundering guidelines, the base offense level is calculated in one of two ways:

> (1)    The offense level for the underlying offense from which the laundered
> funds were derived, if (A) the defendant committed the underlying offense (or
> would be accountable for the underlying offense under subsection (a)(1)(A) of

§1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

(2)     8 plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

U.S.S.G. §2S1.1(a).  This is where the Probation Officer and the parties take a different approach.  The Probation Officer applied subdivision (1), resulting in a base offense level of 7, plus enhancements totaling 28 points, under the fraud guidelines because those guidelines apply to "the underlying offense from which the laundered funds were derived," U.S.S.G. §2S1.1(a)(1).  See PSR ¶¶83-87.  The Probation Officer then applies additional enhancements under the money laundering guidelines—to the extent not already covered under the fraud guidelines—and for leadership role.  After factoring in for acceptance of responsibility, the Probation Officer arrives at a total offense level of 38.  See PSR ¶¶88-96 & n.1

By contrast, the parties start with a base offense level of 8 pursuant to section 2S1.1(a)(2), which is enhanced upwards by 22 levels for the overall amount laundered of more than $25 million, as well as additional enhancements for being in the business of money laundering (+4), sophisticated laundering (+2), leadership role (+2 to +4), which after acceptance of responsibility results in a total offense level of 35 to 37, depending on the extent of the leadership enhancement.

While reasonable minds could disagree on the issue, the government submits that the approach set forth by the parties in the plea agreement is the better approach in this case.  An underlying offense level can be calculated for the core securities fraud schemes at issue in the case—Warrior Girl and Everock—but those securities deals implicate just a fraction of the more than $25 million in laundered proceeds to which the defendant has admitted.  The parties'

approach properly assess the guidelines range based on that full $25 million in laundered proceeds (as does the Probation Officer's approach), but the parties' approach does not seek to apply additional fraud-based enhancements, because the facts of each of the schemes that comprise the more than $25 million in laundered proceeds are different, as is the extend of the defendant's involvement in each substantive securities fraud scheme.  The parties' approach is also the more conservative approach, although the difference in the offense level on the facts of this case is not as substantial as it could be under other circumstances.

The other area of potential dispute is as to the extent of the defendant's leadership role. The Probation Officer applied a four-level enhancement for an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  PSR ¶74.  The parties agree that the defendant should receive some role enhancement, but left the extent of the enhancement open to argument.  See Plea Agreement ¶4.e. ("The defendant should be assessed an aggravating role enhancement pursuant to Subsection 3B1.1, but the parties reserve the right to argue whether the enhancement should be for four, three, or two levels.").

Should this issue remain in contention, the government supports the Probation Officer's application of the four-level enhancement, for the reasons set forth by the Probation Officer:

> Harold Bailey Gallison controlled and operated Moneyline, an offshore brokerage company in Costa Rica, from his home in California. Gallison and his partner, Michael Randles, supervised and directed the activities of their employees, including Ann Marie Hiskey. Gallison also recruited Roger Coleman to launder the proceeds from their securities fraud schemes to and from the United States through a series of nominee bank accounts. Gallison also engaged other co-conspirators willing to engage in promotional activities and secret, coordinated trading to inflate the prices of Warrior Girl. Gallison's company, Moneyline, controlled all the proceeds obtained from the various securities fraud schemes and was responsible for laundering the proceeds. Therefore, Harold Gallison has been assessed a four-level enhancement for being the organizer or leader of a criminal activity that involved five or more participants, pursuant to USSG §3B1.1(a).

PSR ¶74. These facts satisfy the standards set forth in Section 3B1.1, including the extensive scope of Moneyline's activity, the participation of more than five individuals, and the defendant's recruitment of multiple individuals to the conspiracy.[3]

If the Court adopts the government's approach, the defendant would have a total offense level of 37 after acceptance. At criminal history category II, this offense level results in an advisory sentencing range of 235 to 293 months.

## III. OTHER SENTENCING FACTORS

In addition to considering the properly calculated sentencing guideline range, this Court should also consider other factors identified in 18 U.S.C. § 3553(a). The government will address the most pertinent of those factors below.

### Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The defendant created an organization that was designed to shield its clients and their stock activities from the eyes of regulators and the public. He did so by causing individuals such as co-defendant Roger Coleman to open dozens of nominee brokerage accounts, and to lie repeatedly in the account opening documents to hide the existence and identity of the true beneficial owners of stocks deposited into those account. He did so by causing Moneyline clients to retitle their stocks in the name of the nominee entities, with tacit agreement that the

---

[3] The fact that the securities fraud schemes accomplished through Moneyline had their own leaders—such as Frank Zangara with respect to the Everock scheme—does not diminish the defendant's leadership of Moneyline, nor his leadership of its money laundering activities. Moreover, the fact that co-defendant Randles was the defendant's business partner in Moneyline does not strip the defendant of a full leadership role. See, e.g., U.S.S.G. §3B1.1, Comment, Application Note 4 (listing, among the factors to be considered, "the exercise of decision making authority," "the nature of participation in the commission of the offense," "the recruitment of accomplices," "the degree of participation in planning or organizing the offense," and "the degree of control and authority exercised over others"); id. ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

stock remained under the clients' control and that proceeds from liquidations would be provided to the clients.  He did so by recruiting individuals such as co-defendant Ann Hiskey to manage customer relations at Moneyline, which in practice meant coordinating mass promotions and sales of stock with Moneyline's clients.  He did so by communicating with Moneyline staff and clients through a secure internal telephone and internet messaging systems, which the government never would have accessed but for the voluntary conduct of a Moneyline employee who chose to bring these materials to the FBI's attention.

The defendant caused staff to wire moneys out following stock liquidations, and ultimately back to Moneyline clients in the United States in a manner that made it hard to link the moneys to the stock market schemes through which they were obtained.  Moneyline clients had to pay premium fees, on top of compensating Moneyline for the cost of the U.S.-based brokerage houses where the nominee accounts were opened, for the benefits of this opaque structure.  There is no reason why a U.S.-based client engaged in lawful securities trading would knowingly sign over his or her stock to the nominee entities and agree to such a fee structure, yet most of Moneyline's business came from U.S.-based clients dealing in penny stocks.  Simply put, the defendant founded and ran a business that facilitated the commission and concealment of numerous stock market manipulation schemes, and laundered the proceeds back to the schemers.

History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant's history and characteristics form a large part of the government's sentencing recommendation in this case.  The defendant founded Moneyline before going to prison for unrelated securities crimes committed at a prior brokerage house that the defendant owned and operated.  See PSR ¶99.  He was sentenced to five years in the California state penal system, and ultimately served two and a half years in prison.  At no time in his court proceedings

on this prior offense did he reveal Moneyline's existence or his role in its founding.  Upon his

release in 2006, the defendant resumed his contacts with Moneyline and ultimately re-assumed a

leadership and day-to-day management role.  He did so despite not only his prior conviction and

prison term, but also a number of outstanding civil and regulatory judgments and orders—

summarized in paragraphs 129 through 134 of the PSR—including a 2004 SEC order

permanently barring him from "acting as a promoter, finder, consultant, or agent; or otherwise

engaging in activities with a broker, dealer, or issuer for purposes of the issuance or trading in

any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock."

Id. ¶131 (quoting SEC order).

      The PSR also suggests that the defendant may be hiding assets through his common law

wife, who "declined to answer any questions regarding her employment or finances," id. ¶105,

legally changed her name to Gallison but has not married the defendant, id. ¶107 & n.2, owns

their home in her name despite the fact that the defendant contributed money to its purchase, id.

¶107, and maintains separate finances but regularly received money from the defendant while he

was operating Moneyline, id. ¶126.  As of the final PSR, the defendant had not disclosed his

wife's bank account information or the transfers he made to such accounts.  Id.  The PSR also

confirms that the defendant has not paid federal taxes on his income from Moneyline since at

least 2009, as he has not filed any federal income tax returns in that time period.  Id. ¶128.  These

facts suggest that the defendant may well have engaged in the Moneyline conduct with the

knowledge and expectation that he would one day face criminal scrutiny, and has arranged his

affairs to best insulate him from the financial repercussions of such scrutiny.

      The defendant's upbringing and education do not explain his criminal conduct.  He is a

58 year old man who was raised in a supportive family.  His father passed away at age 85 and his

mother is still living and in regular contact with him.  His sister and brother-in-law practice medicine.  He has a daughter from a prior marriage who is 29 years old and is gainfully employed.

The defendant claims to have drinking problem.  The Probation Office havs not been able to fully verify this assertion, <u>see</u> PSR ¶116, although his common law wife confirmed it, <u>id</u>. ¶117.  The government has no independent information as to these matters.  However, and without disrespect to the deleterious effects of alcohol abuse, the government submits that a drinking problem dating back to 2012 does not explain the defendant's participation in the charged schemes, which began much earlier in time.  Moreover, this substance abuse is not of the kind or extent that would cause the defendant to resort to criminal acts in order to financially support his habit.

<u>General and Specific Deterrence (18 U.S.C. § 3553(a)(2))</u>

This defendant's sentencing presents a strong case for both general and specific deterrence.  As to the latter, the defendant's history shows that two and a half years in the California state penal system, and a lifetime bar from the SEC, were not effective in preventing him from resuming criminal activities related to the penny stock market.  Moreover, in creating and running Moneyline, the defendant provided a means for many other individuals engaged in penny stock manipulations to ply their craft, thus showing a willingness to assist others in breaking the law in addition to breaking it himself.

With respect to general deterrence, the government submits that this defendant's sentencing is the clearest opportunity in this multi-defendant case for the Court to issue a sufficiently strong deterrent message.  The sentence imposed in this case should be sufficiently penal to dissuade others, and especially fraud recidivists, from committing similar offenses.

13

Otherwise, the Court risks sending the message that occasional prison terms are an acceptable cost of doing business in the potentially lucrative areas of securities fraud and money laundering.

<u>Avoiding Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))</u>

By any measure, the guidelines range in this case is severe. The government is well aware of the frequency of below-guideline sentences in white-collar criminal cases, and is mindful of the defendant's age and his already-commenced cooperation. Nonetheless, the government submits that the defendant's case and circumstances are substantially more serious than the average white-collar prosecution, and call for a more severe sentence. Such a sentence would not result in unwarranted sentencing disparities.

The closest example of a comparable case is *United States v. Jonathan Curshen et al.*, S.D. Fla. Court Docket Number: 1:11-cr-20131, which was prosecuted in part by one of the undersigned attorneys. Curshen was the founder and leader of a separate brokerage house in Costa Rica, known as Red Sea Management and Sentry Global Securities, that played a role similar to Moneyline. Indeed, when the Curshen prosecution resulted in the closing of that brokerage, a number of its clients moved to Moneyline.

Like this defendant, Curshen was in criminal history category two. His circumstances were more aggravated in that he went to trial and has never accepted responsibility. But his case involved a smaller loss amount, and an ultimate offense level of 38 without acceptance, resulting in an advisory guidelines range of 262 to 327. The District Court sentenced him to 240 months in prison, near the bottom of his guideline range. A roughly comparable sentence in this case— prior to consideration of this defendant's cooperation (which distinguishes him from Curshen)— would not result in unwarranted sentencing disparities.

14

IV.    **ONGOING COOPERATION AND DELAY OF SELF-SURRENDER**

As the Court is aware, the defendant is cooperating with the government.  He testified at the trial of Mark Dresner.  In the government's view, his testimony was truthful and assisted the prosecution of that case.  The government is currently conducting additional debriefs with the defendant, including in the lead-up to his sentencing hearing.  The defendant is in a position to cooperate against the remaining defendants in this case, including Michael Randles, whom we anticipate will be extradited to the United States to stand trial.  Moreover, because of his role in running Moneyline, the defendant is in position to cooperate in a number of investigations as to other stock manipulation schemes beyond Warrior Girl, Everock, and Bryn Resources.  The defendant is also in a position to provide, and is providing, additional documents and records to the government regarding Moneyline's clients and activities.

The parties jointly submit that the defendant should be permitted to continue this cooperation before surrendering to serve his prison term.  From the government's point of view, delaying the defendant's surrender will allow him to more easily access records, to debrief with the government with respect to several ongoing and potential investigations, and potentially to testify under oath, without the sorts of delays that would result from having to writ the defendant from the Bureau of Prison's custody on an ongoing basis.  Delaying his self-surrender also will allow the government to more fully assess the defendant's cooperation, including any additional disclosures about his financial condition that he may make pursuant to the financial provisions of his plea agreement.  If the defendant is as forthcoming on those topics as he has been to date on the specific schemes and co-defendants charged in the Indictment, the government anticipates that it will return to this Court with a motion to reduce sentence pursuant to Criminal Rule 35(b) prior to the defendant's self-surrender date.

15

In light of the scope of the defendant's activities in Moneyline, it is appropriate both for him to be sentenced based upon the breath of its criminal activities (at the upcoming sentencing), and to be given a chance to assist in the investigation and prosecution of others who were engaged in those activities and thereby to reduce his own sentence.

## V.    CONCLUSION

The United States respectfully requests that this Court find that the guidelines in this case result in a total offense level of 37 and an advisory guidelines range of 235 to 293 months.  The government recommends that the Court impose a sentence at the bottom of the guideline range, with delayed self-surrender to permit the defendant to continue his cooperation and potentially return for resentencing pursuant to Criminal Rule 35(b).  The government also will ask the Court to enter forfeiture and (once the victims have been fully identified) restitution orders.  Such punishment would reflect the seriousness of the defendant's conduct, his personal history and characteristics, and the need for general and specific deterrence, while also providing the defendant with a chance to substantially reduce his sentence upon the successful completion of his ongoing cooperation.

Respectfully submitted,

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

By:     _____/s/_____
Kosta S. Stojilkovic
Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314

16

Tel:  (703) 299-3700
Fax:  (703) 299-3981
kosta.stojilkovic@usdoj.gov


ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division, U.S. Department of Justice

By:  _____/s/_____
N. Nathan Dimock
Senior Trial Attorney
Special Assistant United States Attorney (EDVA)
Tel: (202) 514-0095
Fax: (202) 514-6118
nathan.dimock@usdoj.gov
Michael T. O'Neill
Trial Attorney
Special Assistant United States Attorney (EDVA)
Tel: (202) 616-1545
Fax: (202) 514-0152
michael.t.oneill@usdoj.gov
1400 New York Avenue, NW
Washington, DC 20530

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on March 11, 2016 I will file the foregoing pleading with the Clerk of the Court, who will then send a notification of such filing (NEF) to all counsel of record.


                                     /s/
                              N. Nathan Dimock
                              Senior Trial Attorney
                              Special Assistant United States Attorney (EDVA)
                              1400 New York Avenue, NW
                              Washington, DC 20530